# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **CHRIS W.,**[1] | ) | |
| | ) | **No. 17 CV 6532** |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **NANCY A. BERRYHILL, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | **December 3, 2018** |
| **Defendant.** | ) | |

## MEMORANDUM OPINION and ORDER

Chris W. ("Chris") seeks disability insurance benefits ("DIB") based on his claim that he is disabled because of bilateral carpal tunnel syndrome with peripheral neuropathy in both hands, high blood pressure, high cholesterol, damaged Achilles tendon, acid reflux, vertigo, and anxiety. After the Commissioner of the Social Security Administration denied his DIB application, Chris filed this lawsuit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Chris's motion is denied and the government's is granted:

## Procedural History

Chris filed his application for DIB in November 2013, claiming a disability onset date of April 2, 2013. (Administrative Record ("A.R.") 165.) To prevail on his

---

[1] In accordance with the recent recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, this court uses only the first name and last initial of Plaintiff in this opinion to protect his privacy to the extent possible.

DIB claim, Chris must show that he was disabled by his date last insured, which is December 31, 2017. (Id. at 16.) After his claim was denied initially and upon reconsideration, (id. at 87, 96), Chris sought and received a hearing before an administrative law judge ("ALJ"), which took place in July 2016, (id. at 36-79). In September 2016 the ALJ issued a decision finding that Chris is not disabled. (Id. at 16-29.) When the Appeals Council denied Chris's request for review, (id. at 1-7), the ALJ's decision became the final decision of the Commissioner, *see Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). Chris filed this lawsuit seeking judicial review of the Commissioner's final decision, *see* 42 U.S.C. § 405(g); (R. 1), and the parties consented to this court's jurisdiction, *see* 28 U.S. § 636(c); (R. 7).

## Background

Chris was 41 years old and working as a loan processor in April 2013 when he asserts that symptoms from his bilateral carpal tunnel syndrome forced him to stop working. At the July 2016 hearing before the ALJ, Chris submitted both documentary and testimonial evidence in support of his disability claim.

### A.    Medical Evidence

After an electromyography ("EMG") nerve conduction study in 2004, Chris was diagnosed with left side carpal tunnel syndrome. (A.R. 454.) In April 2012 Chris reported tingling and numbness in both hands, thumbs, and index fingers. (Id. at 308.) Chris visited Dr. Gary Young, his treating physician, and complained of bilateral carpal tunnel symptoms which had become more constant in the two months preceding the visit. (Id. at 331.) An examination showed full range of motion, no

deformities, no edema, and no erythema in his extremities. (Id.) Dr. Young diagnosed Chris with early carpal tunnel syndrome. (Id.) He recommended that Chris wear wrist splints and prescribed Naprosyn to reduce inflammation. (Id. at 306, 331.)

The next time Chris saw Dr. Young for carpal tunnel symptoms was in October 2013, almost seven months after his claimed disability onset. Chris reported intermittent carpal tunnel symptoms, with the left hand worse than the right hand. (Id. at 325.) Dr. Young recommended wrist splints to be worn at night. He noted that "if glycohemoglobin is normal and splints don't help, then use prednisone taper." (Id.)

In December 2013 Chris saw Dr. Ninith Kartha for a neurological consultation. (Id. at 508-10.) Chris reported numbness in his palms and fingers, especially his thumbs. (Id. at 509.) He also complained of a weak grip and dropping objects when he held them for a prolonged period. (Id.) A physical exam revealed a positive Phalen's test with numbness and burning in the thumb and index finger. (Id. at 510.) Dr. Kartha advised Chris to repeat the EMG and nerve conduction test to clarify localization and to examine the right hand, which had not been done in 2004. (Id.) Dr. Kartha recommended that Chris wear wrist splints consistently at nighttime and try a trial of amitriptyline for his paresthesia. (Id.) She also referred Chris to an orthopedic clinic. (Id.)

In February 2014 Chris saw Dr. Jorge Aliaga for an internal medicine consultative examination. (Id. at 351-55.) Chris reported a past medical history of carpal tunnel syndrome bilaterally with neuropathy for the last 10 years, which had been worsening over the last couple of years. (Id. at 351.) Chris told Dr. Aliaga that

he had a burning feeling in his hands and fingers, especially at night, which kept him from sleeping. (Id.) Chris also described numbness in his hands, especially when he used his hands for long periods of time to hold objects, write, or type. (Id.) He indicated that he had been using braces without much help. (Id.)

Dr. Aliaga examined Chris and observed that his grip strength was normal, that he could make a full fist, fully extend his fingers bilaterally, and oppose his fingers to his thumb bilaterally, and that his range of motion of the shoulders, elbows, and wrists was normal. (Id. at 353-54.) Dr. Aliaga also observed some mild difficulty in grasping and finger manipulation in both hands. (Id. at 354.) He noted a lack of atrophy of the musculature and recorded negative Tinel's and Phalen's signs bilaterally. (Id.) Based on that examination, Dr. Aliaga described Chris as having possible carpal tunnel syndrome bilateral versus peripheral neuropathy. (Id.)

In March 2014 Dr. Reynaldo Gotanco, a state agency consultant, reviewed the record and determined that Chris did not have a severe physical impairment. (Id. at 80-86.) In October 2014 Dr. Vidya Madala, another state agency consultant, concurred with Dr. Gotanco's assessment that Chris did not have a severe physical impairment. (Id. at 88-95.)

Meanwhile, in June 2014, Chris saw a clinician at National University of Health Sciences ("National"). Chris complained of bilateral tingling and numbness in his fingers and both palms. (Id. at 417.) He described discomfort and annoyance rather than pain, which he rated as 10/10. (Id. at 421.) He reported that typing, holding a cell phone, and driving caused numbness. (Id.) He also stated that daily

massaging of his palms helped decrease his symptoms. (Id.) He started physical therapy, which included rehabilitation and postural exercises. (Id. at 437.)

In July 2014 Chris returned to his treating physician and reported that he was experiencing decreased sensation in the distribution of the median nerve of both hands. (Id. at 359.) Dr. Young again recommended that Chris use wrist splints and a prednisone taper. (Id.) The following month, in August 2014, Chris saw Dr. Michael Bednar for an orthopedic evaluation. (Id. at 454.) He complained of bilateral carpal tunnel symptoms and described increased symptoms with holding a phone for a prolonged time and reported that he had been treated with chiropractic care and had taken Naprosyn. (Id.) He also reported that nighttime braces did not relieve his symptoms, but he had recently taken prednisone with some improvement. (Id.) A physical exam showed positive Tinel's sign and Phalen's maneuver. (Id.) Dr. Bednar recommended right carpal tunnel release surgery, which he then performed on August 20, 2014. (Id. at 454, 490-91.)

In September 2014 Chris saw a clinician at National. (Id. at 401.) He reported some improvement in pain, numbness, and tingling in his right hand since his release surgery a month before. (Id.) He rated his right-hand pain and symptoms as 5/10. (Id. at 401, 405.) However, he described his left-hand symptoms as 10/10. (Id.) An examination revealed positive Tinel's sign over the left thumb associated with shooting pain. (Id. at 403-04.)

Chris returned to Dr. Bednar in October 2014 for a follow-up visit and reported good relief of symptoms on the right side after the release surgery. (Id. at 478.)

Dr. Bednar noted that Chris had a positive Tinel's sign on his left side. (Id.) Chris indicated that he wanted to proceed with left carpal tunnel release surgery. (Id.) Dr. Bednar performed a release surgery on October 27, 2014. (Id. at 488-89.) However, 10 days post-surgery, Chris reported pain throughout his left wrist and some shocking sensations into the digits of his left hand. (Id. at 477-78.)

In January 2015 Chris saw a clinician at National and reported no relief in his left-hand symptoms since his release surgery. (Id. at 393, 396.) He returned to National a week later and reported that his carpal tunnel symptoms had not been as frequent but there had been no change in their intensity. (Id. at 392.) He complained of numbness, but less frequent pain and tingling. (Id.)

On January 21, 2015, Chris returned to see Dr. Young and reported that the release surgery failed to improve his left-hand symptoms, but his right-hand symptoms were 50 percent improved. (Id. at 390.) An examination revealed "decreased sensation of both hands, palmar aspect, both thumbs, all fingers of left hand, and all fingers but little finger of right hand. Fair strength in both hands." (Id.) Dr. Young diagnosed Chris with "persistent bilateral carpal tunnel syndrome, left worse than right, in spite of surgery." (Id.)

In May 2015 Chris saw Dr. Marcus Talerico, an orthopedic surgeon, complaining that he had been experiencing locking and catching of his right thumb and right elbow pain on the lateral aspect for about three to four months. (Id. at 469.) Chris reported that grasping and gripping motions worsened his pain. (Id.) He also reported that he had undergone bilateral carpal tunnel release surgery with "fairly

reasonable relief of symptoms." (Id.) A physical exam found tenderness to palpation at the common extensor origin at the ECRB, pain with resisted wrist extension, tenderness at the A1 pulley of the right thumb, and locking and catching with IP joint motion, but Chris could make a full composite fist with full extension of all right digits. (Id.) A right elbow x-ray demonstrated normal bony architecture with no degenerative changes. (Id.) Dr. Talerico diagnosed right elbow lateral epicondylitis and right thumb stenosing tenosynovitis. (Id. at 469-70.) He administered corticosteroid injections for Chris's right thumb and right elbow symptoms and provided him with an elbow brace to be worn as needed. (Id. at 470.)

Chris returned to Dr. Talerico three months later in August 2015 for a follow-up for his right elbow pain. (Id. at 472-73.) Despite the corticosteroid injection, Chris reported continued right elbow pain, which worsened with grasping or gripping motions. Dr. Talerico ordered a course of occupational therapy for range of motion, pain control, and strengthening and conditioning, but indicated that Chris had no restrictions. (Id. at 473-74.) Despite this order, the record does not show that Chris ever attended occupational therapy.

In October 2015 Dr. Krishdeep Khosla completed a medical source statement. (Id. at 374-81.) He noted a diagnosis of carpal tunnel syndrome, explained that he began treating Chris on July 11, 2015, and last saw him on September 22, 2015, and gave him a fair prognosis. (Id. at 374.) Dr. Khosla left blank the section which asked him to identify the clinical findings and objective signs of Chris's carpal tunnel syndrome. (Id.) He opined that Chris could occasionally lift and carry 20 pounds,

frequently lift and carry 10 pounds, sit or stand 60 minutes at a time, and sit and stand or walk about 6 hours in an 8-hour day. (Id. at 375-78.) He further opined that Chris would need to be able to change positions at will, lie down periodically throughout the day, and receive one extra 30-minute break per day. (Id. at 376-77.) As for absences, Dr. Khosla opined that Chris's carpal tunnel syndrome would cause him to miss work three times per month. (Id.) But he concluded that Chris had no postural or manipulative limitations, could perform repetitive activities involving his hands, had good use of both hands and fingers for bilateral manual dexterity and repetitive hand-finger action, and could manipulate, handle, and work with small objects with both hands. (Id. at 377-78.) He also concluded that Chris was capable of functioning on a part-time basis, and that his symptoms had only a mild impact on his ability to perform activities of daily living. (Id. at 375, 378.)

In December 2015 Chris saw Dr. Leo Hall III for a physical examination. (Id. at 492-93.) Chris complained of random episodes of hand pain, difficulty picking up, grasping, or holding objects, and thumb locking. (Id. at 492.) He indicated that Elavil helped but did not resolve his tingling symptoms. (Id.) He was referred to a neurologist for further evaluation of his persistent numbness and tingling in his hands. (Id. at 495.)

In January 2016 Dr. Khosla completed a second medical source statement for Chris, which is very different from the first statement. (Id. at 382-89.) Unlike his first medical source statement, which indicated that he first began treating Chris on July 11, 2015, and that his prognosis was fair, Dr. Khosla's second statement

indicates that he first began treating Chris on April 7, 2015, and that his prognosis was now guarded.  (Id. at 374, 382.)  For clinical findings and objective signs of carpal tunnel syndrome, Dr. Khosla wrote that Chris had "episodes of severe pain in hand, unable to do daily activities."  (Id.)  He indicated that Chris's pain, other symptoms, or medication side effects often interfered with his attention and concentration up to 50 percent of the day.  (Id.)  He also wrote that Chris's symptoms "interfere to the extent that [he] is unable to maintain persistence and pace to engage in competitive employment[,]" and found that Chris was not capable of performing part-time work. (Id. at 383.)

Dr. Khosla opined that Chris would need one unscheduled 30-minute break in an 8-hour work day and would likely miss four or more days of work per month because of his symptoms.  (Id. at 384.)  He indicated that Chris's symptoms had a moderate impact (no longer mild) on his ability to perform activities of daily living and moderately impaired his ability to maintain concentration, persistence, or pace. (Id. at 385.)  Dr. Khosla stated that Chris needs to change positions at will and to lie down or recline periodically throughout the day to relieve his symptoms.  (Id. at 384, 388.)  He opined that Chris could occasionally lift and carry 10 pounds, sit or stand for 60 minutes at a time, sit for a total of 2-4 hours in an 8-hour day, stand or walk 4 hours in an 8-hour day, and never climb, pull or push, and firm or fine grasp with either hand.  (Id. at 384-85, 388.)  He further opined that Chris could perform repetitive activities involving his hands, has good use of both hands for bilateral

manual dexterity and repetitive hand-finger actions, and could manipulate, handle, and work with small objects with both hands. (Id. at 385, 388.)

A month later, on March 1, 2016, Chris underwent an evaluation by Dr. Armita Bijari, a neurologist, to assess his intermittent episodes of dizziness. (Id. at 441.) Chris reported dizziness, but he had no joint complaints in the upper extremities and no sensory or motor complaints. (Id. at 442.) Dr. Bijari noted "otherwise feels well." (Id.) A physical exam was unremarkable. (Id. at 442-43.) Chris exhibited 5/5 musculoskeletal strength in the upper extremities, deep tendon reflexes were normal, and he had a normal sensory examination. (Id. at 443.)

In conjunction with a mental health assessment for attention deficit hyperactivity disorder ("ADHD") symptoms on May 16, 2016, Chris rated his current hand pain as 4-5/10. (Id. at 598.) He reported that an occasional flare-up of his symptoms caused a burning sensation and rated his pain as 10/10. (Id.) Chris also reported that he could perform household chores and maintain his personal hygiene. (Id. at 596.) He stated that he was totally independent in activities of daily living and that he enjoys socializing, exercising, going outdoors, jet skiing in the summer, getting out of house and doing things in the community, going to the mall, and spending time with his girlfriend. (Id.) On June 10, 2016, Chris reported to Dr. Gregory Gruener that his carpal tunnel symptoms had been reappearing. (Id. at 634.)

**B.     Chris's Hearing Testimony**

Chris described his work history, symptoms, and daily activities at the July 2016 hearing.  He testified that he became disabled in April 2013 when he could no longer perform his job as a loan processor.  (A.R. 42-43, 45.)  He stated that the loan processor job required him to be constantly on the phone and typing, which he was unable to do because of his carpel tunnel.  (Id. at 43, 45-46.)  He also testified about his work as a loan officer and a car salesman.  (Id. at 43-44.)

Chris testified that he is right-handed, that his hands hurt him the most, and that they are constantly cold and numb.  (Id. at 41, 50.)  He explained that he has difficulty holding a fork, knife, pen, and toothbrush for a prolonged period and even buttoning a shirt.  (Id. at 50, 55, 58.)  He can make a fist but cannot hold it.  (Id. at 50.)  He has been taking amitriptyline which helps with his burning palms but interferes with his sleep.  (Id. at 50-51.)  His other medications cause weakness, fatigue, and dry mouth.  (Id.)

As for activities of daily living, Chris testified that he lives with his girlfriend and her daughter and his girlfriend does the cooking.  (Id. at 41, 47.)  He stated that he does not wash dishes, do laundry, mow the lawn, or use a computer.  (Id. at 47.)  He does go grocery shopping.  (Id. at 48.)  He testified that much of his time is spent relaxing, sitting or lying down watching television, reading, and walking around the house and the neighborhood.  (Id. at 48-49.)

## C.    Medical Expert's Hearing Testimony

Dr. Ashok Jilhewar, a medical expert ("ME"), testified at the hearing and opined about the limiting effects of Chris's impairments.  Dr. Jilhewar noted that a May 2004 EMG documented carpal tunnel syndrome but indicated that there were no clinical findings for carpal tunnel syndrome in the record except for the presence of Tinel's sign and Phalen's test.  (A.R. 62.)  Dr. Jilhewar pointed out that there had not been any specific management of Chris's carpal tunnel after his surgeries.  (Id. at 63.)  Dr. Jilhewar also pointed out that there were no EMG and nerve conduction studies after January 2015 when Chris was noted to have 50 percent improvement in his right hand, but no improvement in his left hand.  (Id.)

Dr. Jilhewar considered whether Chris's condition met or equaled Listing 11.14 (peripheral neuropathies) but opined that there was insufficient documentation showing abnormal neurological clinical findings either in the thumb or index finger of either hand.  (Id. at 67.)  Without evidence of an abnormal two-point discrimination test at more than one centimeter, Dr. Jilhewar could not conclude that there were any sensory abnormalities.  (Id.)  In addition, Dr. Jilhewar did not find any record of "motor abnormalities which would have an atrophy in the thenar muscles, or weakness in the abductor hallucis gravis, or moving the thumb away from the palm." (Id.)  In the absence of these clinical findings and the absence of management of his carpal tunnel, except for providing distal and nocturnal brevis, Dr. Jilhewar could not conclude that Chris's condition met or equaled Listing 11.14.  (Id. at 67-68.)

When asked about Chris's residual functional capacity ("RFC") before his date last insured, Dr. Jilhewar testified that between April 2, 2013, and November 17, 2014, Chris could perform light work with frequent reaching in all directions and fine and gross manipulations on a frequent basis.  (Id. at 68-69.)  But on and after November 18, 2014, Dr. Jilhewar opined that Chris could perform sedentary work with the same upper extremity limitations as the first hypothetical and additional postural and environmental limitations because of additional impairments of vertigo and paresthesia in the right lower extremity.  (Id. at 69-70.)

## D.   Vocational Expert's Hearing Testimony

The ALJ also heard testimony from a vocational expert ("VE") about the jobs available to someone with Chris's limitations.  The VE determined that Chris's past relevant work as a car salesperson would be classified as "light both as performed, and per the Dictionary of Occupational Titles ("DOT"), skilled with an SVP of 6, not transferrable below the light level."  (A.R. 74.)  His work as a loan processor would be classified as "sedentary both as performed, and per the DOT, skilled, with an SVP of 5."  (Id.)  Chris's work as a loan officer would be classified as "sedentary both as performed, and per the DOT, skilled, with an SVP of 7." (Id. at 74-75.)

The ALJ asked the VE a series of hypothetical questions regarding an individual with the same age, education, and work experience as Chris.  First, the ALJ asked the VE about the jobs this individual could perform if he had the RFC to perform light work and was limited to frequent postural activities and frequent manipulative activities with his upper extremities.  (Id. at 75.)  The VE answered

13

that this individual could perform the loan officer and car sales jobs.  (Id.)  Next, the ALJ asked the VE about what jobs the individual could perform if he were limited to sedentary work with never climbing ladders, ropes, or scaffolds, never kneeling or crawling, occasionally climbing ramps or stairs, balancing, stooping, and crouching, frequently reaching, handling objects, and fingering bilaterally, and avoiding concentrated exposure to large moving machinery and exposure to unprotected heights.  (Id. at 76.)  The VE said that such a person could still perform Chris's past job as a loan officer.  (Id.)  Finally, the ALJ asked about an individual with the same restrictions as in the second hypothetical, but who could only occasionally reach, handle objects, and finger with the left non-dominant upper extremity and frequently reach, handle objects, and finger with the right dominant upper extremity.  (Id.)  The VE testified that such restrictions would preclude all full-time work.  (Id. at 76-77.)

Chris's attorney also questioned the VE, asking whether missing three or more days per month would impact an individual's ability to perform competitive work. (Id. at 77.)  The VE testified that no more than one day per month or two portions of a workday would be allowable for absenteeism.  (Id.)  Lastly, the ALJ asked the VE what employers customarily expect in terms of on-task requirements.  (Id. at 77-78.) The VE answered that outside of breaks, an individual needs to be on task and functioning at a minimum of 85 percent of the workday to sustain even simple, unskilled competitive work.  (Id. at 78.)  The VE added that the off-task time cannot be for more than five to six minutes at a time.  (Id.)

### E.    The ALJ's Decision

In September 2016 the ALJ issued a decision denying Chris's claim for DIB. (A.R. 16-29.)  The ALJ followed the standard five-step sequence in analyzing Chris's claim.  *See* 20 C.F.R. § 404.1520a.  At step one, the ALJ determined that Chris had not engaged in substantial gainful activity since his alleged disability onset date.  (Id. at 18.)  At step two, the ALJ found that Chris has severe impairments, including: radiculopathy, right lower extremity, secondary to degenerative disc disease of the lumbar spine; carpal tunnel syndrome, bilateral, status post-carpal tunnel release surgery; vertigo; vestibular neuronitis; and tinnitus.  (Id.)  The ALJ found Chris's left heel pain, right lateral elbow pain, and locking and catching of his right thumb to be nonsevere impairments.  (Id. at 18-19.)  At step three, the ALJ found that Chris did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment.  (Id. at 19-22.)

Before turning to step four, the ALJ determined that Chris has the RFC to perform light work, except that he can: frequently climb ladders, ropes, scaffolds, ramps or stairs; frequently balance stoop, crouch, kneel, or crawl; and frequently reach in all directions (including overhead), handle, and finger with the bilateral upper extremities.  (Id. at 23.)  Based on that RFC, the ALJ found at step four that Chris can perform his past relevant work as a loan officer and car salesperson.  (Id. at 28.)  The ALJ noted that even if he had accepted the ME's analysis and found Chris limited to sedentary work beginning on November 18, 2014, Chris could still perform

his past job as a loan officer.  (Id.)  Accordingly, the ALJ concluded that Chris is not disabled.  (Id. at 29.)

## Analysis

Chris argues that the ALJ erred when he failed to place any weight on Dr. Khosla's opinion and to consider his work history when assessing his symptom allegations.  This court reviews the ALJ's decision only to ensure that it is supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (internal quotation and citation omitted).  This court's role is neither to reweigh the evidence nor to substitute its judgment for the ALJ's.  *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013).  That said, if the ALJ committed an error of law or "based the decision on serious factual mistakes or omissions," reversal may be required.  *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

### A.    The Treating Physician Rule

Chris first argues that the ALJ should have accorded more weight to the opinion of Dr. Khosla, his treating physician, instead of relying on the ME's assessment.  Under the treating physician rule, an ALJ must give controlling weight to a treating physician's opinion if it is: "(1) supported by medical findings; and (2) consistent with substantial evidence in the record."[2]  *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).  If the ALJ concludes that a treating physician's opinion is not

---

[2]  The SSA adopted new rules for agency review of disability claims involving the treating physician rule.  *See* 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017).  Because these new rules apply only to disability applications filed on or after March 27, 2017, they are not applicable here.  (Id.)

entitled to controlling weight, he must give "good reasons" for discounting the opinion, after considering the following factors:

> (1) whether the physician examined the claimant, (2) whether the physician treated the claimant, and if so, the duration of overall treatment and the thoroughness and frequency of examinations, (3) whether other medical evidence supports the physician's opinion, (4) whether the physician's opinion is consistent with the record, and (5) whether the opinion relates to the physician's specialty.

*Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016); *see also* 20 C.F.R. § 404.1527(c). As long as the ALJ articulates his reasons, he "may discount a treating physician's medical opinion if it is inconsistent" with the opinion of a consulting physician. *See Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

Here the ALJ adequately explained why he gave Dr. Khosla's medical source statements "no weight." (A.R. 27.) First, he found that Dr. Khosla's limitations "exceeded the available objective evidence." (Id.) For example, Dr. Khosla opined that Chris would likely miss three to four days of work per month and needs one extra 30-minute break per day because of his carpal tunnel symptoms. (Id. at 376, 384.) Dr. Khosla also opined that Chris's carpal tunnel symptoms prevent him from pulling or pushing or using either hand for firm or fine grasping. (Id. at 388.) However, the ALJ noted that in January 2015, while Chris reported continued pain in both hands after his release surgeries, he acknowledged about a 50 percent reduction of pain in the right hand. (Id. at 20, 25.) The ALJ pointed out that Chris indicated in May and August 2015 when he met with an orthopedic surgeon that the surgeries had provided "fairly reasonable relief of symptoms." (Id.) Furthermore, the ALJ observed that there was no evidence of clinical testing by the surgeon for signs suggesting renewed

carpal tunnel syndrome. (Id. at 25.) The ALJ also considered that in December 2015, Chris reported to a primary care physician that he was experiencing random episodes of hand pain that made it difficult to pick up, grasp, or hold objects and that an examination by the physician found decreased sensation in Chris's hands. (Id.) But the physician did not perform any clinical testing to detect renewed carpal tunnel syndrome in either hand and there was no evidence of decreased grip strength. (Id. at 25, 27.) The ALJ also noted that other than a referral to a neurologist, no treatment was provided at that time for Chris's symptoms. (Id. at 25.)

Second, the ALJ accurately found that Dr. Khosla did not submit any treatment notes or refer to treatment notes that supported the limitations. (Id. at 27.) The only documents in the record from Dr. Khosla are the two competing medical source statements. There are no treatment notes, test results, or other evidence from Dr. Khosla to support his opinions in the record and no explanation for the lack of his treatment notes. Thus, it was unclear to the ALJ how Dr. Khosla arrived at his conclusions.

Third, the ALJ explained that Dr. Khosla lacked support for his opinion that Chris is limited in his ability to perform activities of daily living and tolerate change. (Id.) The record supports this finding. For example, Chris reported in May 2016 that he is totally independent in activities of daily living and no physician other than Dr. Khosla expressed concern about Chris's ability to perform daily activities or tolerate change because of his conditions. (Id. at 596.) Because an ALJ can decide how much weight to afford a treating physician's opinion based on its supportability and

consistency with the record, the ALJ did not err here in rejecting Dr. Khosla's medical source statements. *See* 20 C.F.R. §404.1527(c); *Brown*, 845 F.3d at 252.

Finally, the ALJ rejected Dr. Khosla's finding that Chris is limited in his ability to maintain concentration because this limitation is not noted in the medical record. (A.R. 27.) This explanation gives the court pause. Contrary to the ALJ's assertion, the record contains some evidence of limitations in maintaining concentration. For instance, during a mental health assessment in May 2016, Chris reported a history of an inability to focus and concentrate as early as kindergarten. (Id. at 607.) Chris stated that he has difficulty functioning in restricted environments where he must focus on and complete a specific task for a lengthy period and that he has historically failed to complete work-related tasks and responsibilities in a timely manner because of deficits in concentration and attention. (Id.) Chris was diagnosed with moderate ADHD, among other things, and underwent a month of treatment. (Id. at 595-625.) Nonetheless, the flaw in this aspect of the ALJ's analysis does not amount to reversible error. Because Chris has not argued that the ALJ committed any error in analyzing his limitations related to mental health in formulating the RFC, any potential challenge to this portion of the ALJ's decision is waived. (R. 12, Pl.'s Mem. at 9 n.2.) Moreover, as explained above, the ALJ provided several other good reasons for rejecting Dr. Khosla's opinion that are supported by the record.

Furthermore, the ALJ properly relied on Dr. Jilhewar's opinion that Chris could perform light work during the period prior to November 18, 2014. (A.R. 26.) The ALJ explained that Dr. Jilhewar reviewed the complete record, was familiar with

the regulations that govern disability analyses, and provided a detailed explanation to support his opinion. (Id.) The ALJ reasonably gave less weight to Dr. Jilhewar's opinion that Chris could perform sedentary work beginning on November 18, 2014, based upon the videonystagmography ("VNG") performed on that date. Because the VNG study was normal with no findings suggestive of an equilibrium problem, the ALJ noted that nothing in the VNG report led him to conclude that Chris was reduced to a sedentary level of work as of November 18, 2014. (Id. at 26-27, 475.)

Chris also argues that the ALJ did not explicitly refer to the regulatory factors required under 20 C.F.R. § 404.1527(c) when he rejected Dr. Khosla's opinion. Under such circumstances, the relevant inquiry is "whether the ALJ sufficiently accounted for the factors in 20 C.F.R. § 404.1527 and built an 'accurate and logical bridge' between the evidence and his conclusion." *Schreiber v. Colvin*, 519 Fed. Appx. 951, 959 (7th Cir. 2013) (citations omitted). The court finds that the ALJ met this standard because his decision shows that he was aware of and considered many of those factors, and he logically connected the evidence in the record to his rejection of Dr. Khosla's opinion. The ALJ explicitly identified Dr. Khosla as Chris's treating physician. (A.R. 27.) He also considered the consistency of Dr. Khosla's opinion with the medical record and the supportability of the opinion. As discussed, Dr. Khosla's opinion was inconsistent with Chris's statements regarding the severity of his post-surgery symptoms, the lack of clinical findings suggesting renewed carpal tunnel syndrome, and the lack of treatment for carpal tunnel following his surgeries as well as the lack of treatment notes by Dr. Khosla in support of his opinion. *See Henke v.*

*Astrue*, 498 Fed. Appx. 636, 640 n.3 (7th Cir. 2012) (holding that the "ALJ did not explicitly weigh every factor while discussing her decision to reject Dr. Preciado's reports, but she did note the lack of medical evidence supporting Dr. Preciado's opinion, and its inconsistency with the rest of the record. This is enough.").

Chris's argument that the ALJ should have considered other factors under the regulations is undermined by his own failure to introduce evidence pertaining to those factors. "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citation omitted). Chris claims here that the ALJ "neglected to consider Dr. Khosla's longitudinal, consistent treating relationship" with him but cites to no evidence concerning that factor. (R. 12, Pl.'s Mem. at 8.) The record is silent on the precise length, nature, or extent of the treatment relationship between Chris and Dr. Khosla, and there is limited information on the frequency of Dr. Khosla's examination of Chris. *See* 20 C.F.R. §404.1527(c)(2)(i)-(ii). Dr. Khosla gave two different dates for when he began treating Chris: April 7, 2015, and July 11, 2015. (A.R. 374, 382.) Regardless, the length of Dr. Khosla's treating relationship with Chris was limited when he gave his October 2015 and January 2016 opinions. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by the treating source, the more weight we will give to the source's medical opinion."). There is also no evidence that Dr. Khosla specializes in an area related to his opinion. Dr. Khosla is a specialist in internal medicine, not orthopedics or neurology. (A.R. 389.) Without such evidence,

the ALJ reasonably gave no weight to Dr. Khosla's opinion.  In sum, Chris did not meet his burden of presenting supporting evidence to the ALJ on this issue and he "cannot fault the ALJ for his own failure to support his claim of disability."  *See Scheck*, 357 F.3d at 702.

## B.    Symptom Evaluation

Chris next argues that the ALJ erred by failing to consider his lengthy work history in assessing his symptom allegations, a factor he says lends to his credibility. This court gives an ALJ's assessment of the claimant's symptom statements "special deference," overturning that decision only if it is "patently wrong."  *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017).  The Seventh Circuit has observed that a "claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability."  *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015).  However, an ALJ's silence with respect to a claimant's work history does not require reversal when the credibility determination is otherwise supported by substantial evidence.  *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016).

Contrary to Chris's contention, the Seventh Circuit has not required ALJs to consider work history when evaluating credibility.  *See Summers*, 864 F.3d at 528 (finding that the "ALJ did not commit reversible error by failing to explicitly discuss Summers's work history when evaluating her credibility"); *Stark v. Colvin*, 813 F.3d 684, 689 (7th Cir. 2016) ("An ALJ is not statutorily required to consider a claimant's work history[.]").  The ALJ in this case thoroughly examined the medical and

testimonial evidence and adequately explained why he found it inconsistent with the severity of the symptoms and limitations Chris describes. (A.R. at 24-27.) As Chris has not otherwise specifically challenged the ALJ's credibility finding, the ALJ's failure to acknowledge Chris's work history does not render the credibility assessment "patently wrong."

## Conclusion

For the foregoing reasons, Chris's motion for summary judgment is denied, the government's is granted, and the final decision of the Commissioner is affirmed.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**